MIRCH LAW FIRM LLP
Kevin J. Mirch, Bar No. 106973
kevinmirch@mirchlaw.com
Marie C. Mirch, Bar No. 200833
marie@mirchlaw.com
Erin E. Hanson, Bar No. 272813
ehanson@mirchlaw.com
750 B. St., Suite 2500
San Diego, CA 92101
(619)501-6220 tel.
(619)501-6980 fax
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

**DIVISION**

BRADLEY SAYRE,

Plaintiff,

vs.

JP MORGAN CHASE & CO, JP MORGAN CHASE SECURITIES, LLC, DOES 1-10

Defendants.

**Case No.** '17CV0449 JLS MDD

**COMPLAINT**

**1) Violation of Dodd-Frank Act**

**2) Wrongful Termination in Violation of Public Policy**

**3) Violation of the Securities Exchange Act of 1934 10b-5 Fraud in the Trade of Securities**

**4) Violation of California Corporations Code Section 25401**

**5) Violation of California Business and Professions Code Section 17200 et seq.**

Demand for Jury Trial

Plaintiff, Bradley Sayre by and through his attorney of record alleges and avers

as follows:

**Preliminary Provisions:**

1. Plaintiff, Bradley Sayre , is a resident of San Diego County California.

2. Defendant, JP Morgan Chase & Co. is a Delaware corporation, doing business throughout the world, including operating and doing business within the state of California including San Diego County.

3. J.P. Morgan Securities LLC is a Delaware limited liability company doing business in California as offering security brokerage services. The firm provides cash and wealth management; stock and options management; and education and retirement planning services. J.P. Morgan Securities LLC operates as a subsidiary of J.P. Morgan Broker-Dealer Holdings Inc.

4. "J.P. Morgan Securities" is a marketing name for a wealth management business conducted by JPMorgan Chase & Co. and certain subsidiaries. J.P. Morgan Securities offers investment products, services, Clearing and Custody through J.P. Morgan Securities LLC, a member of FINRA and SIPC. Bank products and services are offered by JPMorgan Chase Bank, N.A. and its bank affiliates.

5. Plaintiff is ignorant of the true names and identities of Does 1-10, but nonetheless, sues the same as if more fully set forth herein. At such time as the true names and identities are known, Plaintiff will seek leave to amend this complaint.

6. Whenever the term Defendant is used without specific exclusion of any other Defendant, then all the Defendants are included in that term. This applies even if the term "Defendant" is used in the singular or the plural. Unless otherwise identified, "JP Morgan Chase" or "JPMC" refers to JP Morgan Chase & Co and JP Morgan Securities, LLC.

7. Plaintiff is informed and believes, and based upon such information and belief alleges, that each of the defendants sued herein was the agent, assignee, parent company, affiliate, wholly owned subsidiary, of each of the remaining defendant, and each of them in

doing the actions alleged below was acting within the course and scope of said agency or position.

## Jurisdiction and Venue

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 in that the Complaint asserts claims under federal law. The Court also has supplemental jurisdiction over any appurtenant state law claims pursuant to 28 U.S.C. §1367. Venue is proper pursuant to 28 U.S.C. §1391 because the Plaintiff resides in the Southern District of California, and JP Morgan Chase & Co. does business in the Southern District of California.

## FACTUAL ALLEGATIONS

9. On or about May 9, 2011, Plaintiff was hired by JPMC as a Vice President-Investments, Private Client Advisors.

10. At the time that Plaintiff was hired, he was assured by JPMC managers, other brokers, supervisors, and internal auditors that "The Company" operated in accordance with a written "Compliance Operating System", which had been approved by JPMC compliance officers, its internal auditors, outside auditors, and independent state and federal regulators, including, but not limited to the "Securities Exchange Commission and "FINRA".

11. As a Vice-President of Investments, Private Client Advisor, Plaintiff provided financial services to his clients. "Financial services" includes, but is not limited to: financial advice on a spectrum of topics, including, but not limited to, income tax, estate planning, and advising clients on the purchase and sale of financial products including but not limited to insurance annuity and securities products.

12. At all times relevant hereto, JPMC acted as a licensed securities broker-dealer overseeing a number of licensed Brokers including, but not limited to, Plaintiff.

13. Plaintiff was a registered securities broker employed by JPMC.

14. From May 9, 2011 through March 4, 2014, Plaintiff was subjected to regularly conducted internal and/or independent audits.

15. It was Plaintiff's practice to take notes during JPMC product seminars, training sessions, meetings and/or of conversations with supervisors, managers, other JPMC FA/Brokers, JPMC administrative employees, Plaintiff's own clients, and/or state and federal regulators. After JPMC meetings, Plaintiff would file his notes and any JPMC sales materials in appropriate client files.

16. During the time that Plaintiff was employed by JPMC, he followed all JPMC protocols, policies and procedures, including, but not limited to, customer file retention and maintenance rules.

17. While employed by JPMC, Plaintiff was not "documented" and/or otherwise "written up" until he questioned the order for destruction of JPMC sales materials maintained in client files and instructions to leave blank client information specifically required in a JPMC compliance form (i.e., "JPMC Change Form"). Plaintiff reported this to management of JPMC.

18. Plaintiff relied upon JPMC's allegedly "vetted Product Information" and JPMC sales materials in providing insurance annuity advice to his clients. The information was false or misleading.

19. Plaintiff relied upon JPMC to consistently follow instructions regarding the sale of securities and financial advice.

20. JPMC provided its brokers with financial product performance data in a number of ways, including, but not limited to: product seminars, computer presentations, marketing materials, "internal use only" product memoranda, discussions with managers, and/or through communications with its "Broker Services" group.

21. JP Morgan regularly conducted FA/Broker product seminars which included factual assertions that were contrary to the public marketing materials. JP Morgan regularly provided its FA/Brokers with internal documents that they were told they could rely upon in client/customer sales presentations. The internal documents included historic and expected

profits and/or rates of return for securities products being sold. JP Morgan management misrepresented actual product performance and future expectations to its FA/Brokers in order sell its security products. Mr. Sayre's files contained detailed notes which proved that JP Morgan was exaggerating rates of return on its securities products in internal documents, seminars and other communications with its FA/Brokers in order to increase sales.

22. JPMC regularly represented that all of its products were "financially vetted" prior to the time that the same were available to JPMC Brokers' clients. JPMC created sales materials for their vetted products. The sales materials included glossy pamphlets, videos, internal use only memoranda with projected revenues and risk analysis. The factual data contained JPMC sales materials, included, but was not limited to: expected rates of return, risk factors, and/or other relevant buying/selling points (e.g., early surrender charges, commission on replacement, etc.)

23. Whenever a JPMC Broker had a question about a JPMC form, its "Broker Services" department was available to answer the same.

24. It was Plaintiff's practice to retain all documents he relied upon in giving financial advice and/or recommending securities products.

25. On or about February 1, 2013, Plaintiff was promoted.

26. During 2013, JPMC initiated a number of new policies, procedures and protocols regarding the retention of client and broker records.

27. During, on or after, September 1, 2013, Plaintiff was instructed to review all of his client and broker files; to remove and destroy all records that were not required to be maintained; and thereafter only retain mandated records.

28. On or about October, all JPMC brokers were told to remove and destroy those notes and JPMC sales materials.

29. After being instructed to destroy broker and client records, Plaintiff requested specific JPMC written policies, procedures and protocols mandating the retention and/or

mandatory destruction of broker-dealer/broker/client records. Plaintiff has not received those records as of the date of this complaint.

**JP Morgan's "Set Up" to justify termination**

30. Upon information and belief, JPMC attempted to "set up" Plaintiff for termination. The "set up" involved the assignment of two new clients that had allegedly owned insurance annuity products that could have been redeemed immediately and replaced with other similar insurance annuity products. The "set up" as described herein would have resulted in unjustified redemption fees/charges and/or commissions earned by JPMC and/or Plaintiff.

31. Upon information and belief, Plaintiff met with the allegedly "new clients" and after disclosing the potential hazards of early redemption and replacement, made a decision to hold the insurance annuity products subject to a full investigation into the matter. At the time that decision was made, Plaintiff did not know that he was being "set up" as described herein.

32. At this time, Plaintiff believes that he was instructed by a JPMC employee/manager to review records allegedly provided to JPMC by clients Philam and Sylvia Oronan. Those documents allegedly included, but were not limited to, insurance annuity records owned either solely and/or jointly by Philam and Sylvia Oronan.

33. As a result of instructions received from JPMC, Plaintiff contacted Philam Oronan and/or Sylvia Oronan to arrange a meeting for October 12, 2013.

34. At all times relevant hereto, Plaintiff reasonably believed that Philam and Sylvia Oronan were married individuals residing within the State of California and owning insurance annuity products that they sought professional advice about. Plaintiff did not recommend any JPMC insurance annuity product to the Oronans, clients that JPMC assigned to Plaintiff. In fact, he discussed problems associated with the products.

35. On or about October 12, 2013, Plaintiff contacted JP Morgan's Broker Services

to confirm that "JP Morgan's Agency/Broker Dealer of Record Change Request For Annuity Contracts/Insurance Policies" form was the correct form to use and that the steps taken by the Plaintiff were compliant under JP Morgan's standard policies and procedures protocols.

36. Without Plaintiff's knowledge, JPMC initiated an internal audit starting on the same day that he was referred the Oronans as "new clients".

37. In Plaintiff's conversations before the October 12, 2013 Oronan meeting that the Company's forms had changed. Specifically, the most current JP Morgan "Agency/Broker Dealer of Record Change Request For Annuity Contracts/Insurance Policies" was different than previous forms used by Plaintiff. The current form consisted of 2 separate sections: (1) Change of Broker Dealer/Broker of Record and (2) Customer Information part. According to instructions on page 1 of Advisor Instructions # 2, Plaintiff was required to "Complete the Agency/Broker Dealer of Record Change Request Form" and "Customer Information" form.

38. The first two pages of that form was entitled "Agency/Broker Dealer of Record Change Request". The second part (pages 3 - 4) was the "Customer Information Form". JP Morgan's "Brokers Services" representatives confirmed that only one Customer Information form was necessary per contract owner. The instructions state as follows: "Only one Customer Information Form is required when submitting multiple requests for the same contract owner".

39. Prior to the Oronan's October 12, 2013, meeting, parts of the form were prepared from information in the Oronan's customer files. The Oronans had provided recent statements regarding the four contracts prior to this meeting as the Oronans were existing clients that had recently opened a joint annuity account with JP Morgan. Accordingly, much of the information needed to fill out the "Agency/Broker Dealer of Record Change Request For Annuity Contracts / Insurance Policies" form was available. Prior to the Oronan's October 12, 2013 meeting, most of the Form had been typed onto four separate versions

of the Agency / Broker Dealer of Record Change Request (pages 1 - 2) prepared for four transactions. Since three of the four transactions were for the same contract owner and one transaction involved joint ownership, only 2 separate Customer Information forms were prepared for client authorization. The remainder of the form was to be completed by hand during the October 12, 2013 meeting (i.e. Drivers license #, issue and expiration date).

40. During the Oronan's October 12, 2013, meeting Plaintiff read and discussed each part of the form to the Plaintiffs. The blank spaces were completed by the Oronans or Plaintiff during that meeting.

41. The Oronans filled in the blanks in the form, but did not initial each place where they had filled in the forms. Initialing the filled in spaces was not required prior to that time by JP Morgan compliance officers or the form instructions, nor had Plaintiff received any JP Morgan training which required initialing of handwritten portions of any form.

42. On October 12, 2013, Philame Oronan had signed in six places (once for each of the four Broker/ Dealer Change forms being requested, once for the Customer Information form pertaining to the three insurance contracts that he was the sole owner, and once for the Customer Information form that he and his spouse were the joint owners). Sylvia signed in two places (once for the Broker/ Dealer Change Request that she was a joint contract owner and once for the Customer Information form that she was a joint contract owner on.

43. Shortly after Oronan's meeting, all the requests were faxed in accordance with JP Morgan's processing rules. The forms were immediately processed without complaint by JP Morgan.

44. After the forms were processed, the forms were organized for retention and placement in the Oronan's customer file. In efforts to maintain what was thought to be appropriate for the client files, a copy of the originally signed Customer Information form (pages 3 - 4) used to process all three of the requests of which Philame Oronan was the sole owner was stapled to the original Agency / Broker Dealer of Record Change Request forms

(pages 1 - 2) for two of the three sets of forms created for Philame.

45. Plaintiff did three things associated with the Oronan/JPMC "new client" professional relationship: (1) contacted by phone Philam Oronan to discuss and/or otherwise learn basic business information about himself and his wife, Sylvia Oronan; (2) arranged a date for a meeting at JPMC's offices on or about October 12, 2013; and (3) to prepare the "JPMC Change Form" from information in existing JPMC records and from communications directly or by phone, and/or social media. The "JPMC Change Form" requested basic administrative information, including, but not limited to the formal names of the new clients, addresses, insurance and annuity products owned outside the JPMC relationship, but intended by the "new clients" to be considered in a financial plan suited to their specific needs.

46. JPMC fabricated reasons to "write up" and/or otherwise "document" Plaintiff for his preparation of the Oronans respective "JPMC Change Forms" because Plaintiff believed that the redemption of the JPMC insurance annuity products would be expensive and not justified by any available replacement product's return on investment.

47. Shortly after October 12, 2013, Courtney Vysocky, initiated an internal audit of the Tierrasanta bank branch of JPMC, which was one of two locations assigned to Plaintiff as an insurance annuity securities licensed Broker. The audit specifically focused on paperwork prepared by Plaintiff in conjunction with the Oronans' business relationship with JPMC as a "Broker-Dealer" and Plaintiff as the Oronans' "Broker of Record".

48. Shortly after Plaintiff's meeting with the Oronans was held on October 12, 2013, Plaintiff submitted the four "JPMC Change Forms" numbers one (1) through four (4) to JPMC processing department for review and comment. Because he had attached copies of Philam Oronan's "Suitability Section" from his "JPMC Change Form" one (1), pages two (2) and three (3) to his "JPMC Change Forms" two (2) and three (3), and explained his why to his compliance department, he was resolved of immediate wrongdoing and Vysocky was questioned for instructing Plaintiff to leave blank those sections.

49. During January, 2014, JP Morgan conducted a routine audit of Plaintiff's customer files. After which, Plaintiff's Supervisory Manager - Courtney Vysocky told Plaintiff that any partly typed and partly handwritten form required separate client initials adjacent to any handwritten sections of the form regardless of the client authorizing completeness and accuracy of the document and then signing the end of the form.

50. Courtney Vysocky cited Plaintiff for this in the above case and other files. She also cited Plaintiff specifically for the above mentioned file because there were two copies of the original Customer Information form (pages 3 - 4) attached to pages 1 - 2 on two of the three Agency / Broker Dealer of Record Change Request forms processed on behalf of Philame Oronan. She asked Plaintiff why there were copies of the Customer Information form to which I replied per my understanding of processing and conversation with broker services only one original Customer Information form was necessary. As a result of Plaintiff's conversation with Courtney Vysocky in January, 2014, Plaintiff believed there was simply a lapse in communication between Broker Services, Processing, and Plaintiff regarding initialing requirements.

51. Plaintiff did not learn until after February 1, 2013, that JPMC had determined that Plaintiff's performance in arranging and participating in the Oronans meeting was deficient and/or violated JPMC policies, procedures and/or protocols. When Plaintiff learned that his participation in that meeting was improper or otherwise deficient, he was only instructed to be more careful with documents maintained in his broker and/or client files.

52. Defendant created and used new forms as part of its fraudulent sales practices. In this case, the "JPMC Change Form" was used as a tool to convince "new clients" to purchase more expensive and less profitable products. When Plaintiff refused to leave parts of the form blank and misrepresenting rates of return and redemption costs, JPMC determined that Plaintiff should be terminated for cause.

53. JPMC used the "JPMC Change Form" as a tool justify purchasing "new clients"

complained about surrender fees, high commissions, lack of liquidity, high risk, and lower annuity returns, the "Broker of Record" listed in the "JPMC Change Form" was deemed responsible for the same.

54. During October of 2013, Plaintiff requested JPMC's internal policies, rules, and regulations regarding file retention and destruction of sales materials used in providing advice to clients. At the time that this request was made, Plaintiff did not believe or have any reason to believe that JPMC was attempting to destroy "The Company's" fraudulent sales materials that had been used to sell its financial products.

55. Subsequently, Plaintiff was targeted by Vysocky acting in her capacity as a manager with upper level instructions to target any broker who questioned the destruction of JPMC sales materials relied upon in providing investment advice. During 2013, JPMC initiated a policy to "clean" up its client files. This was allegedly being done as firm wide attempt to organize and streamline its operations.

**PLAINTIFF REPORTS MANAGEMENT DESTRUCTION OF DOCUMENTS**

56. During October, 2013, JPMC managers and supervisors were told by JPMC upper management of its securities business, not to keep any documents in their customer files other than actual financial transaction documents. At that time, JPMC was involved in private negotiations with the United States Department of Justice over the fraudulent sale of collateral backed securities, hereinafter sometimes referred to as "collateralized derivative products".

57. The October 2013 negotiations between JPMC and DOJ took place in the United States Attorney General Office in Washington, D.C.. As a result of these private negotiations, JPMC attorneys and upper management, initiated a plan to prevent other investigations related to the fraudulent sale of its securities. That scheme involved retaliation against any JPMC broker that questioned the removal and destruction of its customer files.

58. Subsequent to the October 2013 SEC settlement, all client/customer records were

incomplete records that could not be used by SEC/FINRA auditors to determine if misrepresentations were being made to its FA/Brokers and thereafter passed on to client/customers

59. Mr. Sayre relied upon marketing materials and/or "internal JP Morgan" documents in determining projected rates of return and risk for securities products approved for sale to his clients, he copied the same and placed them in his clients' files.

60. Prior to March 4, 2014, other JP Morgan FA/Brokers had also maintained their securities product notes and internal/external materials in client files.

61. Shortly before March 4, 2014, an internal auditor discovered that Mr. Sayre was taking detailed notes about JP Morgan representations concerning product rates of return and risk factors. Mr. Sayre's written notes concerning JP Morgan represented rates of return and risk factors were contained in his client/customer files. JP Morgan searched for and destroyed Mr. Sayre's written notes reflecting misrepresented rates of return and risk factors.

62. Prior to March 4, 2014, Mr. Sayre had experienced a number of internal audits without being told that he should not take and/or retain written notes from product seminars, meetings and/or any other communication.

63. Mr. Sayre complained that there were no protocols for client files and it was improper to remove and destroy documents. Specifically, Mr. Sayre requested instructions regarding notes he had taken during JP Morgan product seminars, meetings, and discussions with other FA/Brokers. Mr. Sayre also questioned internal/external JPMorgan product documents which detailed historic and projected rates of return along with risks associated thereto.

64. Shortly before March 4, 2014, Mr. Sayre was instructed to remove most of his notes and internal JP Morgan product documents he had relied upon in making presentations to his clients/customers. The "internal use only" product records were documents that JP Morgan provided to its FA's to be used in oral presentations to clients. The "internal use

only" records contained upwardly inflated rates or return and lower risk factors.

65. After realizing that Mr. Sayre had taken notes of intentionally false statements made by JP Morgan sales supervisors and his managers, Mr. Sayre was instructed not to put his notes and/or JP Morgan "internal use only" documents in client files. This was done to avoid the SEC finding that JP Morgan was still misrepresenting its products through unknowing FA's.

66. Shortly before March 4, 2014, Mr. Sayre was told to exclude his product notes and/or internal/external JP Morgan materials in his client files. Prior to that time, Mr. Sayre had maintained those notes in his client files.

67. At the time that Mr. Sayre was instructed to destroy his client securities notes, he did not have any client complaints pending and was not formally told that the notes contained any false representations. Mr. Sayre's notes came from 4 sources: (1) his clients; (2) JP Morgan seminars; (3) JP Morgan product meetings; and (4) from private meetings with JP Morgan managers, supervisors or JP Morgan approved wholesalers.

68. In this case, JP Morgan was instructing its brokers to cleanse its customer files for insurance annuities which could be redeemed early and reinvested in other annuities which were technically securities products can be disastrous. The result of forfeiting one insurance annuity and placing those funds in another annuity that is deemed to be a security had no business rational since they reduced the overall value of client investments generate much needed cash for JP Morgan .

69. Prior to March 4, 2014, Mr. Sayre had requested specific protocols regarding the composition of JP Morgan client files. Despite that request, Mr. Sayre never received client file protocols, let alone specific instructions to omit product notes and/or internal/external product materials from client files.

70. Mr. Sayre reported and questioned the policy of destroying documents contained in his clients' files.

71. Plaintiff also complained that it was improper to leave the "suitability" section of a client's form blank, and attached the suitability information to the form. After Plaintiff complained to his manager about being instructed to leave blank "suitability sections" in 3 out of 4 of the Oronos Broker-Dealer-Broker of Record forms, he was subjected to an intense internal audit.

72. The internal audit allegedly determined that Plaintiff was not maintaining customer files and/or document retention correctly.

73. JP Morgan as a broker-dealer was obligated to train its FA/Brokers about its securities products.

74. JP Morgan product training included, but was not limited to, seminars, meetings, and information provided in "internal use only" documents.

75. During October 2013, JP Morgan settled a number of actions with the SEC for $13 billion. The SEC suit and settlement concerned misrepresentations made to JP Morgan clients in order to induce the purchase of securities products. After JP Morgan was fined $13 billion in October 2013 by the SEC, the company instructed its FA/Brokers not to keep product notes and/or its "internal use only product" documents in its client files.

76. JP Morgan did not have an established protocol for maintaining what was essentially its client "work product" in separate non-client files. The "work product" included any product notes and/or JP Morgan "internal use only" records used by Mr. Sayre and other FA's in providing financial advice to their clients.

77. Once JP Morgan FA notes and its "internal use only" records are removed from a client file, it is difficult to prove that any product misrepresentations have been made.

78. JP Morgan caused all of its FA/Brokers product notes and its own "internal use only" records to be removed from all of its client files. This was done to destroy evidence that could be used to prove that misrepresentations were knowingly made by JP Morgan during its product training process.

79. Shortly before Mr. Sayre's March 4, 2014 termination, he was instructed by a JP Morgan supervising manager, Morgan Mertz, and a JP Morgan compliance manager, that he should not keep "securities product notes" and/or JP Morgan "internal use only product memoranda" in client files.

## RETALIATION

80. JPMC retaliated against Plaintiff when he reported he was being instructed to leave blank the "Client Information" section of "JPMC's Change Forms"numbered two (2) and three (3).

81. The retaliation involved but is not limited to:

A. Plaintiff was provided two "new clients with previously acquired ownership of insurance annuity products.

B. Plaintiff was instructed to prepare documents necessary for the Oronans to become "JPMC new clients with insurance annuity products. To become JPMC "new clients", the Oronans were required to prepare and appropriately execute a "JPMC Change Form".

C. Plaintiff was told by JPMC managers and "JPMC Broker Services" to prepare four (4) separate "JPMC Change Forms," one for each insurance annuity product acquired by another "Broker-Dealer" independent from JPMC.

D. JPMC was aware The insurance annuity products owned prior the Oronans presenting to JPMC, were the subject of fraud allegations.

E. Because the Oronans' insurance annuity products were the subject of fraud allegations, JPMC welcomed the Oronans. JPMC intended to disclose that the Oronans' insurance annuity products were worth substantially less than the amount that they were purchased for. JPMC intended to purchase the Oronans' insurance annuity products at a substantial discount, bundle and sell them as part of a derivative investment product offered to the public. The derivative investment would yield fees, costs, early withdrawal penalties, sell the Oronans replacement insurance annuity products subject to substantial commissions, early penalty withdrawals of principal; and eventually life insurance benefits.

F. Plaintiff was given the Oronans as "new clients with insurance annuity products" acquired from another Broker-Dealer independent from JPMC. Plaintiff was then instructed not to include vital information on the change forms.

G. When Plaintiff questioned JPMC orders to leave blank "client suitability sections" of a compliance form used for insurance annuity products (i.e., "JPMC Change Form" in the "Client Information Section" dealing with "suitability", Plaintiff decided to attach a copy to each of the Oronans Second (2nd) and Third (3rd) "JPMC Change Forms" and file the paperwork with JPMC's processing and compliance

departments.

H. Termination.

I. Failed to timely file correct U-5.

J. Interfered with prospective employment opportunities.

82. From September 1, 2013, until after the JPMC filed Plaintiff's FINRA form U-5 on or about, May 16, 2014, Plaintiff did not know that he was being retaliated against due to admissions made by JPMC attorneys that Plaintiff's termination was a mistake that would be corrected.

**TERMINATION; UNTIMELY FALSE U-5; AND INTERFERENCE WITH PLAINTIFF'S EMPLOYMENT OPPORTUNITIES**

83. On or about, March 4, 2014, Mr. Sayre was informed by his manager, Morgan Mertz and another JP Morgan compliance manager, that his employment was terminated and he was physically escorted from JP Morgan in front of JP Morgan bank employees.

84. Shortly before Mr. Sayre's March 4, 2014, termination, JP Morgan informed Mr. Sayre to remove his product notes and JP Morgan's "internal use only records" from his file. Mr. Sayre questioned the propriety of destroying documents.

85. After being terminated on March 4, 2014, Mr. Sayre requested from JP Morgan his U-5. Mr. Sayre never received a U-5 which discussed his March 4, 2014, termination. Instead, Mr. Sayre received a letter from JP Morgan employee, Mr. Pakvan, dated May 19, 2014. Attached to the May 19, 2014, letter was a U-5, that states that Mr. Sayre had voluntarily terminated his position on May 12, 2014, and his termination was voluntary without being told to resign in lieu of an involuntary termination.

86. JP Morgan was required to file Mr. Sayre's U-5 within 30 days following his termination March 4, 2014. JP Morgan did not comply. Instead, JP Morgan realized that it had no grounds to terminate Mr. Sayre on March 4, 2014. In order to prevent regulatory problems including, but not limited to: being told to remove from client files his personal

notes, marketing materials and "internal use only product documents".

87. During the latter part of April 2014 JP Morgan took the position that the March 4, 2014, termination was incorrect, and therefore, JP Morgan did not have to file a U-5 related to that incident. JP Morgan's position would only be true if Mr. Sayre had not been terminated on March 4, 2014, and remained an employee until May 12, 2014, the date filed on the attached U-5.

88. As of March 4, 2014, the value of Mr. Sayre's book of business was approximately $800,000. In Mr. Pakvan's May 19, 2014, letter to Mr. Sayre, JP Morgan took the position that Mr. Sayre's book of business was owned by JP Morgan, and therefore, Mr. Sayre was not entitled to any remuneration for the same. Shortly after March 4, 2014, Mr. Sayre's clients were transferred to other JP Morgan FA's/Brokers who solicited Mr. Sayre's clients by explaining that Mr. Sayre had left JP Morgan. That was not true as according to JP Morgan, Pakvan's May 19, 2014, letter and attached U-5, Mr. Sayre was still a JP Morgan employee until May 12, 2014.

89. When Mr. Sayre went to work for USAA, none of his clients/customers (i.e., "book of business") were left. As a result, Mr. Sayre's job hunting was restricted to RIA type of positions (i.e., Registered Investment Advisors). Because Mr. Sayre's "book of business" was distributed immediately after his March 4, 2014, termination, Mr. Sayre was not eligible for "signing bonuses" normally paid by wire houses such as Merrill Lynch, Wells Fargo, and Bank of Tokyo Mitsubishi.

90. Upon information and belief, JP Morgan intentionally used deceptive trade practices in order to obtain Mr. Sayre's "book of business" and to protect itself from further SEC/FINRA investigations.

91. The deceptive techniques used, include, but are not limited to: (1) denying that Mr. Sayre had been terminated on or about March 4, 2014; (2) insisting that Mr. Sayre had never terminated, but instead was classified as a JP Morgan employee, on, or about, March 4, 2014;

(3) refusing Mr. Sayre's access to his client/customer files, their addresses, e-mails, and/or telephone numbers; (4) misrepresented to Mr. Sayre that his clients were temporarily being managed by other FA/Brokers until his false March 4, 2014 termination could be resolved. (5) At the same time that JP Morgan was representing to Mr. Sayre that his clients were being temporarily managed, JP Morgan had already permanently distributed Mr. Sayre's "book of business" to other JP Morgan FA/Brokers; (6) and, upon information and belief, instructing those so called temporary JP Morgan FA/Brokers to tell Mr. Sayre's clients/other employees/customers (i.e., "book of business") that an internal audit had uncovered compliance problems associated with the manner in which Mr. Sayre was conducting his securities business. As a consequence, Mr. Sayre has lost his "book of business" which was worth more that $800,000.00 and took over 7 years to develop; prevented Mr. Sayre from and forced him to become a RIA without being able to conduct his securities business on a commission basis.

92. Upon information and belief, after Mr. Sayre's March 4, 2014, false termination, misrepresentations were made to Mr. Sayre's clients until, at least May 12, 2014, the date shown on JP Morgan's U-5 attached to the Pakvan letter dated May 19, 2014. Upon information and belief, Mr. Sayre's clients were informed by JP Morgan that he had violated a number of compliance statutes, rules and regulations and/or had terminated his relationship or been terminated for cause by JP Morgan on or about March 4, 2014.

93. JP Morgan has failed, refused and/or neglected to pay Mr. Sayre the fair market value of his "book of business".

94. Upon information and belief, JP Morgan used its alleged investigation of Mr. Sayre to stop him from seeking employment elsewhere; to buy time necessary to convince Mr. Sayre's clients to stay at JP Morgan; to destroy Mr. Sayre's reputation in the securities business; and to prevent Mr. Sayre from disclosing JP Morgan's intentional destruction of significant evidence; that, upon information and belief, JP Morgan was systematically

misrepresenting securities products through its training and "internal use only" memoranda.

95. JP Morgan knew that FINRA required the filing of a Form U-5 whenever one of its FA/Brokers were terminated.

96. JP Morgan also knew that the U-5 had to be filed within 30 days after Mr. Sayre's March 4, 2014, termination.

97. JP Morgan has never filed with FINRA and/or sent Mr. Sayre, a U-5 related to his March 4, 2014 termination.

98. Mr. Sayre was told he was terminated on March 4, 2014, but was not actually terminated. In a "Statement of Claim" filed with FINRA, Plaintiff, believed that JP Morgan had kept Mr. Sayre as an employee for fear that he would disclose to regulators that his notes proved that JP Morgan, both prior to and after October 2013, misrepresented rates of return and risk related to its securities products.

99. JP Morgan justified its failure to file a FINRA Form U-5 by acting as if Mr. Sayre's March 4, 2014 termination did not occur. JP Morgan used the 30 day FINRA filing date to remove "Internal use only" product documents from his client files and to adjust its position from termination to always an employee to prevent Mr. Sayre from making any allegations to FINRA/SEC.

100. Following his false termination, JP Morgan intentionally designated Mr. Sayre as an unpaid JP Morgan employee, without a place to work; with his "book of business" scattered amongst its remaining FA/Brokers; without authority and/or permission to transact any securities business.

101. Upon information and belief, Mr. Sayre was falsely reclassified as an employee after his March 4, 2014 termination at JP Morgan in order to buy enough time to "cull" his client files of his notes and JP Morgan "internal use only" records.

102. On May 19, 2014, JP Morgan sent Mr. Sayre a letter which instructed Mr. Sayre that he was to (1) cease transacting all business on behalf of JPMS and/or its customers; (2)

stop representing himself as having any affiliation with JP Morgan or any affiliate with JPMS or any of its Affiliates in any capacity; (3) cease, for one year, following his termination from soliciting, contacting or inducing to leave JP Morgan/Chase any of its employees or any customers acquired, maintained, serviced or developed while employed by JPMS; and that he was required to deliver all information concerning all current JP Morgan customers to his supervisor.

103. JPMorgan has failed, refused and/or neglected to compensate Mr. Sayre for the time period from March 4 - May 11, 2014 in which Mr. Sayre was apparently an employee of JP Morgan, yet he did not receive a paycheck because JP Morgan misrepresented to Mr. Sayre that he was terminated. JPMorgan has also failed, refused, and/or neglected to pay Mr Sayre for his “book of business” valued at approximately $800,000.00.

104. Subsequent to his March 4, 2014, termination, Mr. Sayre and/or his counsel, repeatedly requested a correct Form U-5. The U-5 was necessary for Mr. Sayre to obtain FA/Broker employment elsewhere.

105. Since Mr. Sayre’s March 4, 2014 termination, JP Morgan has not paid Mr. Sayre any commissions generated from his “book of business”, any salary, or draw.

106. Prior to March 4, 2014, Mr. Sayre did not believe nor was he told that he was going to be terminated for any securities compliance issues.

107. On or about, May 12, 2014, Mr. Sayre instructed JP Morgan to transfer his securities licenses to USAA Securities.

108. Mr. Sayre specifically did not state that he had voluntarily resigned without cause, because he was at least “constructively terminated” and/or misrepresentations were made to Mr. Sayre that he was terminated by JP Morgan on March 4, 2014.

109. On or about, September 11, 2014, Mr. Sayre verified that his March 4, 2014, termination had caused him damage in an amount in excess of $800,000.00. That amount reflected the loss of his “book of business” and 2 months of income from March-May 2014.

110. On or about May 12, 2014, Mr. Sayre was forced to accept a position with another securities firm as an Registered Investment Advisor.

111. On May 12, 2014, Mr. Sayre accepted employment with USAA Investment Managers. Mr. Sayre was not paid a "signing bonus" because he did not have a "book of business" by the time that he accepted that employment.

112. The USAA RIA job is a fixed salary position which is substantially less than the commission income generated by Mr. Sayre's "book of business" at JP Morgan.

**FINRA Arbitration Claim**

113. Following his termination and false U-5, Mr. Sayre filed a Statement of Claim against JP Morgan Chase to be arbitratioed before the Finacials Indistry Regulatory Authority (FINRA).

114. JP Morgan Chase delayed filing its answer to the IFNRA Statement of Claim for over a year.

115. According to, "JPM's Answer to Plaintiff's Statement of Claim", the internal audit resulted in fabricated findings stating in pertinent part as follows:

> Chase Wealth Management Branch Supervisory Log from the Tierrasanta branch noted on November 27, 2012 that it had to discard outdated marketing material from Claimant's files and that "FA [Claimant] was advised of policy."
>
> Chase Wealth Management Branch Supervisory Log from Clairemont Square dated October 23, 2013 found two instances where Claimant made alterations without getting the necessary initials from the client. Outdated marketing materials were also reported within Claimant's files.
>
> A Chase Wealth Management Branch Supervisory Log from Kearney Mesa also dated October 23, 2013 identified outdated sales materials in Claimant's files and denoted re-reviewing the sales material policy with him.
>
> A Chase Wealth Management Branch Supervisory Log from Tierrasanta again dated October 23, 2013 found two files with changes lacking the necessary client-initialed approval. Outdated sales materials were again found in Claimant's files, and it was noted the sales material policy was reviewed with Claimant.
>
> An audit of the Kearny Mesa branch dated November 10, 2013 identified that it encountered an outdated prospectus within Claimant's files.

An email from supervisory manager Courtney Vysocky to Claimant, dated January 30, 2014, identified over ten questions with Claimant's file maintenance spread throughout three branches. Despite the fact that JPMS reviewed the sales materials policy with Claimant just a few months before, Ms. Vysocky reported finding additional sales materials violations. Ms. Vysocky also requested, "Please clean out your drawers there. I found a ton of old call lists, training material, expense reports, etc."

116. According to Defendant's "Answer to Petitioner's FINRA Statement of Fact", Plaintiff was terminated as a result of these internal audit findings, on March 4, 2014, and escorted out of JPM offices on the same day.

117. Three out of the six internal audit findings occurred on or about October 23, 2013. Each of the internal audit findings dealt with maintenance of customer files and/or document retention.

118. The March 4, 2014, termination was based on file maintenance and document retention issues. The file maintenance and document retention were contrary to the rules and regualtions of the SEC, State of California Corpoations Code, FINRA rules and regulations, JPMorgan's internal rules, which prohibit the destruction of evidence.

119. After being accused of violating file maintenance and document retention rules, Plaintiff requested a copy of written policies and procedures for customer file maintenance and document retention.

JPM's Code of Finance Professionals provides in pertinent part as follows:

> ...
> (4) Adherence to this Policy is a term and condition of employment for Finance Professionals.
> ...
> (6) JPM made it very clear that violations of this Policy would constitute violations of law, which may expose both Employees and the firms to criminal or civil penalties.
> ...

JPM's Code of Finance Professionals also provided Standards of Conduct in pertinent part as follows:

> (1) JPMC Finance Officers and Finance Professionals must act honestly, promote ethical conduct and comply with the law, particularly as related to the maintenance of the firm's financial books and records and the preparation of its financial statements. They are specifically required to:
>
> > ...
> > (B) **Comply with applicable government laws, rules and regulations** of federal, state and local governments and other appropriate regulatory

> agencies
> ( C ) **Assist in the production of full, fair, accurate, timely and understandable disclosure in reports and documents** that the firm and its subsidiaries file with, or submit to, the Securities and Exchange Commission and other regulators and in other public communications made by JPMC
> ...

The JPM Code of Finance Professionals also required certain reporting requirements, which provide in pertinent part as follows:

> ...
> (D) JPM procedures, rules, regulations, and **protocols strictly prohibited intimidation or retaliation** against anyone who made a good faith report about a known or suspected violation of this Policy, or of any law or regulation.

120. JPMorgan violated its own policies and procedures, as well as federal and state law.

121. JP Morgan's deceptive trade practices have violated a number of state and federal securities rules, regulations and statutes. JP Morgan violated a number of state and federal statutes, rules and regulations by requiring its FA's to conceal and destroy client notes taken by its FA's and "internal use only"product documents from securities regulators and clients.

122. JP Morgan not only violated SEC/FINRA rules and regulations by destroying documetns it also violated its obligation to timely file a truthful U-5 within 30 days of Mr. Sayre's March 4, 2014, termination. Its subsequent conduct constituted a fraudulent "cover up". The "cover up" consisted of intentionally not filing a timely U-5; taking and distributing Mr. Sayre's "book of business" after the March 4, 2014, termination without paying him the market value for the same; directing Mr. Sayre to file a false U-4 stating that he voluntarily resigned; and threatening to file a false U-5 with allegations that Mr. Sayre had violated JP Morgan internal compliance rules and regulations related to the sale and/or purchase of securities; being told to find and destroy "internal use only" product records that inflated expected rates of return and risk factors contained in his file

**FIRST CAUSE OF ACTION**

**VIOLATION OF THE DODD-FRANK**

**WALL STREET REFORM AND CONSUMER PROTECTION ACT**

123. Plaintiff incorporates by reference all the allegations of this complaint as if more fully set forth herein.

124. At all relevant time periods, Plaintiff was an employee of Defendant JP Morgan Securities, LLC, a wealth management business conducted by JPMorgan Chase & Co.

125. Plaintiff complained to Defendant's officers, directors, and/or managing agents that certain of JP Morgan Chase's activities violated securities and industry rules and regulations, including internal controls.

126. The Dodd-Frank Act protects all covered employees from retaliation for … (c) "making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002," the Securities Exchange Act of 1934, or "any other law, rule, or regulation subject to the jurisdiction of the [SEC]." 15 U.S.C. § 78u-6(h).

127. The Dodd-Frank anti-retaliation provision, 15 U.S.C. § 78u-6(h)(1)(A), provides that "[n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistle blower in the terms and conditions of employment because of any lawful act done by the whistle blower."

128. Plaintiff reported to his supervisors and complained and disclosed JP Morgan Chase’s conduct which violated the state and federal securities law, rules and regulations. As such, Plaintiff was a whistle blower and is protected by the Dodd Frank Act.

129. On March 4, 2014, Defendant JP Morgan Chase & Co. terminated Plaintiff. This termination was substantially motivated by the complaints and disclosures made by Plaintiff as detailed above.

130. Defendant intentionally engaged in ongoing retaliation against Plaintiff in reckless disregard for his federally protected rights under the Dodd-Frank Wall Street

Reform and Consumer Protection Act, specifically 15 U.S.C. § 78u-6(h)(1)(A), by, among other things, terminating his Employment Agreement without cause and against public policy, and terminating his implied Employment Agreement against public policy in response to complaints he made to management regarding conduct he believed to be violative of the Sarbanes-Oxley Act of 2002, the Exchange Act, Dodd Frank Act, and SEC rules and regulations, and conduct that he believed adversely impacted and was purposefully hidden.

131. Plaintiff made complaints to management regarding the illegal conduct detailed above. Plaintiff was then targeted and retaliated against and his employment was wrongfully terminated.

132. As a proximate result of Mr. Sayre's complaints about the destruction of "internal use only" memoranda which misstated the value and financial return on JP Morgan securities products, JP Morgan wrongfully terminated the Plaintiff, initially refused to file a timely U-5, made false representations subsequently to Plaintiff about his termination (i.e., that he was not terminated, and when he requested a FINRA arbitration hearing he was maligned with a false and misleading answer which was late filed in an attempt to further destroy his credibility in the securities industry.

133. As a proximate result of JP Morgan's conduct, Mr. Sayre has suffered harm, including lost earnings and other employment benefits, humiliation, embarrassment, and mental anguish, and other special and general damages, all to his damage in an amount to be established at trial.

134. In committing the acts set forth above, JP Morgan and the other Defendants knew that the conduct that they would have required of Mr. Sayre was unlawful, and required Mr. Sayre to choose between violating the law and/or JP Morgan policy and losing his job. Notwithstanding this knowledge, JP Morgan subjected Mr. Sayre to cruel and unjust hardship in conscious disregard of Mr. Sayre's rights by resisting Mr. Sayre's efforts and then terminating Mr. Sayre's employment. JP Morgan's conduct warrants the assessment of

punitive damages.

135. Plaintiff has retained an attorney in order to prosecute this action and accordingly, Plaintiff is entitled to reasonable attorney fees and costs related thereto.

136. In committing the acts herein mentioned, Defendant acted arbitrarily, capriciously, maliciously and with reckless disregard for Plaintiff and accordingly Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth herein.

**SECOND CAUSE OF ACTION**

**WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**

137. Plaintiff incorporates by reference each of the allegations contained herein.

138. Plaintiff's termination was wrongful because it was in violation of the public policy of the United States in that Plaintiff's termination was in retaliation for Plaintiff's opposing and reporting illegal activity, as described in preceding allegations.

139. Defendant's termination of Plaintiff was in violation of the Dodd-Frank Act which makes it illegal to fire or otherwise discriminate against an employee for providing information of a violation of a rule of the Securities and Exchange Commission or any provision of federal law relating to fraud against shareholders. 18U.S.C.§ 1514A(a)(1), including when the employee provides information or assistance to someone with "supervisory authority over the employee" or with authority to "investigate, discover, or terminate misconduct" as Plaintiff did.

140. As a direct, foreseeable, and proximate result of defendant's wrongful termination of Plaintiff in violation of the public policy of the State of California, Plaintiff has lost and will continue to lose income and benefits, and has suffered emotional distress.

141. As a legal and proximate result of Defendants' actions, Plaintiff has suffered special and general damages in an amount in excess of $100,000 to be proven at trial.

142. Plaintiff has retained an attorney in order to prosecute this action and

accordingly, Plaintiff is entitled to reasonable attorney fees and costs related thereto.

143. In committing the acts herein mentioned, Defendant through its managerial employees or managing agents acted arbitrarily, capriciously, maliciously and with reckless disregard for Plaintiff and accordingly Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth herein.

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934 10B-5 FRAUD IN THE TRADE OF SECURITIES.**

144. Plaintiff incorporates by reference each of the allegations contained herein.

145. The Securities and Exchange Act of 1934 Rule 10b-5, which prohibits fraud, misrepresentation, and deceit in the sale and purchase of securities.

146. Defendant by its conduct, employed a scheme to defraud its employees and customers.

147. Defendant made untrue statements of a material fact and/or to omitted a material fact necessary in order to make the statements not misleading. Defendant instructed its employees, including Plaintiff to participate in this wrongful conduct. Employee refused.

148. Defendant engaged in acts, practices, and a course of business which operated as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

149. Plaintiff refused to participate in the fraudulent conduct, and as a result was chastised, humiliated, and ultimately terminated.

150. As a legal and proximate result of Defendants' actions, Plaintiff has suffered and has suffered emotional distress, special and general damages in an amount in excess of $1,000,000 to be proven at trial.

151. Plaintiff has retained an attorney in order to prosecute this action and accordingly, Plaintiff is entitled to reasonable attorney fees and costs related thereto.

152. In committing the acts herein mentioned, Defendant through its managerial employees or managing agents acted arbitrarily, capriciously, maliciously and with reckless disregard for Plaintiff and accordingly Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth herein.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA CORPORATIONS CODE SECTION 25401**

Plaintiff incorporates by reference each of the allegations contained herein.

153. California Corporations Code Section 25401 provides that it is unlawful for any person to offer or sell a security in this state, or to buy or offer to buy a security in this state, by means of any written or oral communication that includes an untrue statement of a material fact.

154. Defendant by its conduct, employed a scheme to defraud its employees and customers in violation of California Corporations Code Section 25401.

155. Defendant made untrue statements of a material fact and/or to omitted a material fact necessary in order to make the statements not misleading. Defendant failed to exercise reasonable care to determine the truth or falsity of the statement. Defendant instructed its employees, including Plaintiff to participate in this wrongful conduct. Employee refused.

156. Defendant engaged in acts, practices, and a course of business which operated as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

157. Plaintiff refused to participate in the fraudulent conduct, and as a result was chastised, humiliated, and ultimately terminated.

158. Plaintiff has lost and will continue to lose income and benefits, and has suffered emotional distress.

159. As a direct legal and proximate result of Defendants' actions, Plaintiff has

suffered emotional distress, and special and general damages in an amount in excess of $1,000,000 to be proven at trial.

160. Plaintiff has retained an attorney in order to prosecute this action and accordingly, Plaintiff is entitled to reasonable attorney fees and costs related thereto.

161. In committing the acts herein mentioned, Defendant through its managerial employees or managing agents acted arbitrarily, capriciously, maliciously and with reckless disregard for Plaintiff and accordingly Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth herein.

## FIFTH CAUSE OF ACTION

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE 17200 ET SEQ.

162. Plaintiff incorporates by reference each of the allegations contained herein.

163. By committing the acts alleged herein, the defendant engaged in an unlawful, unfair, and/ or fraudulent business act or practice.

164. Plaintiff refused to participate in the unlawful, unfair or fraudulent conduct, and as a result was chastised, humiliated, and ultimately terminated.

165. Plaintiff has lost and will continue to lose income and benefits, and has suffered emotional distress.

166. As a direct legal and proximate result of Defendants' actions, Plaintiff has suffered emotional distress, and special and general damages in an amount in excess of $1,000,000 to be proven at trial.

167. Plaintiff has retained an attorney in order to prosecute this action and accordingly, Plaintiff is entitled to reasonable attorney fees and costs related thereto.

168. In committing the acts herein mentioned, Defendant through its managerial employees or managing agents acted arbitrarily, capriciously, maliciously and with reckless

disregard for Plaintiff and accordingly Plaintiff is entitled to punitive damages in an amount to be determined at the time of trial.

WHEREFORE, Plaintiff prays for relief as set forth herein.

**PRAYER FOR RELIEF**

With respect to the preceding claims for relief, Plaintiff prays for relief as set forth below:

1. That Defendant be ordered to pay to Plaintiff a sum in excess of $1,000,000.00, the exact amount of which will be proven at the time of trial;

2. That Defendant be ordered to pay to Plaintiff a sum, the exact amount of which will be proven at the time of trial, for Plaintiff's lost earnings, both past and future;

3. That Defendant be ordered to pay Plaintiff a sum in excess of $1,000,000.00, the exact amount of which will be proven at the time of trial, for Plaintiff's physical and mental pain.

4. That Plaintiff be awarded exemplary damages, as permitted by law, as a result of Defendant willful and wanton misconduct in a sum in excess of $1,000,000.00;

5. That Plaintiff be awarded the attorney's fees and court costs that Plaintiff incurred in the prosecution of this Complaint; and

6. Such other and further relief as the court may deem just and equitable in the premises.

///

///

///

///

///

**JURY DEMAND**

Plaintiff demands a jury in this action.

Dated this 6th day of March, 2017.

By /s/Marie Mirch

Mirch Law Firm LLP
750 B. St., Suite 2500
San Diego, CA 92101
Kevin J. Mirch, Bar No. 106973
Marie C. Mirch, Bar No. 200833
Erin E. Hanson, Bar No. 272813